**KING & SPALDING LLP**
ARWEN R. JOHNSON (SBN 247583)
  *arwen.johnson@kslaw.com*
KELLY PERIGOE (SBN 268872)
  *kperigoe@kslaw.com*
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 443-4310

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| RENZIE WILSON PRICE,<br><br>Plaintiff,<br><br>v.<br><br>NETFLIX CORP., *et al.*,<br><br>Defendants. | Case No. 2:22-cv-00627-JAK (PDx)<br>*The Honorable John A. Kronstadt*<br>*Courtroom: 10B*<br><br>**DEFENDANTS' MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)**<br><br>**[Request for Judicial Notice; Declaration of Arwen R. Johnson with exhibits filed concurrently herewith]**<br><br>Date:       June 6, 2022<br>Time:       8:30 a.m.<br>Judge:      Hon. John A. Kronstadt<br><br>Action Filed: November 12, 2021<br>Trial Date:   Not Set |

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on June 6, 2022, at 8:30 a.m., or as soon thereafter as the matter may be heard before the Honorable John A. Kronstadt of the above-entitled Court, located at United States Courthouse, 350 W. 1st Street, Los Angeles, CA 90012, Courtroom 10B, Defendants Netflix, Inc. (erroneously sued as Netflix Corp.), Michael B. Jordan, Carol Barbee, Dennis Liu, Jason Piperberg, Charles D. King, Kim Roth, Poppy Hanks, Kenny Goodman, Outlier Society, LLC (erroneously sued as Outlier Society Production Co.), and MACRO Media LLC (collectively, "Defendants") will and hereby do move the Court to dismiss Plaintiff's First Amended Complaint (the "FAC"), with prejudice, pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion"). The grounds for the Motion are that the allegedly infringing works are not substantially similar to Plaintiff's novel as a matter of law and Plaintiff failed to register his novel with the U.S. Copyright Office, as required to bring a claim for copyright infringement.

This Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the accompanying Request for Judicial Notice ("RJN") and Declaration of Arwen R. Johnson ("Johnson Decl.") in support thereof with attached exhibits, the pleadings and records on file in this case, all matters of which the Court may take judicial notice, and such other or further material as may be presented at or before the hearing on the Motion. This Motion is made following the conference of counsel pursuant to Local Rule 7-3, which began on February 7, 2022. (Declaration of Arwen R. Johnson ("Johnson Decl."), ¶ 8.)

1   DATED:  February 14, 2022          KING & SPALDING LLP
2                                      ARWEN R. JOHNSON
                                       KELLY PERIGOE
3

4                                       _/s/ Arwen R. Johnson_____
5                                         ARWEN R. JOHNSON
6                                         Attorneys for NETFLIX, INC.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

I.    INTRODUCTION.................................................................................................1

II.   BACKGROUND..................................................................................................2

    A.    Plaintiff's Novel: *December's Eve – The Novel by Renzie*.......................2

    B.    The *Raising Dion* Comic Book .................................................................3

    C.    The *Raising Dion* Short Film ...................................................................4

    D.    The *Raising Dion* Television Series.........................................................4

    E.    Plaintiff's Action .......................................................................................7

III.  LEGAL STANDARD...........................................................................................7

IV.   ARGUMENT .......................................................................................................8

    A.    Plaintiff's Claim Fails Because He Did Not Register His Novel .............9

    B.    Plaintiff's Claim Fails for Lack of Substantial Similarity ......................10

    C.    The FAC Should Be Dismissed Without Leave to Amend .....................25

V.    CONCLUSION ..................................................................................................25

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Abdullah v. Walt Disney Co.*,
   714 F. App'x 758 (9th Cir. Mar. 8, 2018) ................................................ 11

*Abdullah v. Walt Disney Co.*,
   No. 15 Civ. 9581 (SVW)(JPR), 2016 WL 5380930 (C.D. Cal. Mar.
   14, 2016) ...................................................................................... 12, 19, 21

*Alfred v. Walt Disney Co.*,
   821 F. App'x 727 (9th Cir. 2020) ........................................................... 11

*Art Attacks Ink, LLC v. MGA Entm't Inc.*,
   581 F.3d 1138 (9th Cir. 2009) .................................................................. 8

*Astor-White v. Strong*,
   No. CV 15-6326 PA, 2019 WL 3017684 (C.D. Cal. June 14, 2019) ...................... 15

*Bayman v. Disney Enters., Inc.*,
   No. CV 17-8827-DMG (JEM), 2018 WL 5094902 (C.D. Cal. June 1,
   2018) ...................................................................................................... 25

*Benay v. Warner Bros. Entm't, Inc.*,
   607 F.3d 620 (9th Cir. 2010) ............................................................ 9, 17

*Berkic v. Crichton*,
   761 F.2d 1289 (9th Cir. 1985) ........................................................ 15, 22

*Bernal v. Paradigm Talent & Literary Agency*,
   788 F. Supp. 2d 1043 (C.D. Cal. 2010) .................................................... 9

*Carlini v. Paramount Pictures Corp.*,
   No. 2:19-cv-08306-SB-RAP, 2021 WL 911684 (C.D. Cal. Feb. 2,
   2021) ...................................................................... 12, 13, 15, 21, 23

*Cavalier v. Random House, Inc.*,
   297 F.3d 815 (9th Cir. 2002) .............................. 9, 12, 15, 21, 22, 23

*Clanton v. UMG Recordings, Inc.*,
   No. 20-cv-5841 (LJL), 2021 WL 3621784 (S.D.N.Y. Aug. 16, 2021) .................... 8

*Cline v. Reetz-Laiolo*,
    329 F. Supp. 3d 1000 (N.D. Cal. 2018)....................................................15

*Corbello v. Valli*,
    974 F.3d 965 (9th Cir. 2020) ....................................................................9

*Crawford v. Midway Games Inc.*,
    No. 07 Civ. 00967 (FMC) (JCX), 2008 WL 11334537 (C.D. Cal. Dec.
    3, 2008) ....................................................................................................18

*Esplanade Prods., Inc. v. Walt Disney Co.*,
    768 F. App'x 732 (9th Cir. Apr. 24, 2019)..............................................11

*Fillmore v. Blumhouse Prods., LLC*,
    771 F. App'x 756 (9th Cir. 2019)...............................................7, 11, 25

*Folkens v. Wyland Worldwide, LLC*,
    882 F.3d 768 (9th Cir. 2018) ...................................................................20

*Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*,
    139 S. Ct. 881 (2019)............................................................................9, 10

*Funky Films, Inc. v. Time Warner Entm't Co.*,
    462 F.3d 1072 (9th Cir. 2006)...............................8, 14, 15, 16, 17, 23, 24

*Gilbert v. New Line Prods., Inc.*,
    No. CV 09-02231 RGK, 2009 WL 7422458 (C.D. Cal. Mar. 5, 2020).................14

*Historical Truth Prods., Inc. v. Sony Pictures Entm't, Inc.*,
    No. 93 Civ. 5529 (MBM), 1995 WL 693189 (S.D.N.Y. Nov. 22,
    1995).............................................................................................12, 13, 18

*Kiely v. Universal Music Grp.*,
    No. CV 19-4826-MWF, 2020 WL 4037161 (C.D. Cal. Mar. 5, 2020)..................10

*Kouf v. Walt Disney Pictures & Television*,
    16 F.3d 1042 (9th Cir. 1994) ..............................................................12, 23

*Lichtfield v. Spielberg*,
    736 F.2d 1352 (9th Cir. 1984) .................................................................15

*Loomis v. Cornish*,
    836 F.3d 991 (9th Cir. 2016) .....................................................................8

DEFENDANTS' MOTION TO DISMISS AND SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES

*Marcus v. ABC Signature Studios, Inc.*,
    279 F. Supp. 3d 1056 (C.D. Cal. 2017) ................................................................. 19

*Masterson v. Walt Disney Co.*,
    821 F. App'x 779 (9th Cir. 2020) ............................................................... 10, 11

*Mattel, Inc. v. MGA Entm't, Inc.*,
    616 F.3d 904 (9th Cir. 2010) ........................................................................ 9

*Mendiondo v. Centinela Hosp. Med. Ctr.*,
    521 F.3d 1097 (9th Cir. 2008) ...................................................................... 7

*Mills v. Netflix, Inc.*,
    No. CV 19-7618-CBM-(AGRx), 2020 WL 548558 (C.D. Cal. Feb. 3,
    2020) ...................................................................................................... 8

*Olson v. Nat'l Broadcasting Co.*,
    855 F.2d 1446 (9th Cir. 1988) .................................................................... 25

*Rentmeester v. Nike, Inc.*,
    883 F.3d 1111 (9th Cir. 2018) ............................................................... 10, 25

*Ricketts v. CBS Corps.*,
    439 F. Supp. 3d 1199 (C.D. Cal. 2020) ................................................... 8, 25

*Shame on You Prods., Inc. v. Elizabeth Banks*,
    120 F. Supp. 3d 1123 (C.D. Cal. 2015) ................................................... 8, 24

*Silas v. Home Box Office, Inc.*,
    201 F. Supp. 3d 1158 (C.D. Cal. 2016) ...................................................... 15

*Silas v. Home Box Office, Inc.*,
    713 F. App'x 626 (9th Cir. Feb. 22, 2018) .................................................. 11

*Washoutpan.com, LLC v. HD Supply Construction Supply Ltd.*,
    No. 2:19-cv-00494-AB, 2019 WL 9050859 (C.D. Cal. Aug. 5, 2019) ................. 10

*White v. Twentieth Century Fox Corp.*,
    572 F. App'x 475 (9th Cir. May 2, 2014) .................................................... 23

*White v. Twentieth Century Fox Corp.*,
    No. CV11-01987, 2012 WL 13008330 (C.D. Cal. Apr. 11, 2012) ........................ 7

*Zella v. E.W. Scripps Co.*,
    529 F. Supp. 2d 1124 (C.D. Cal. 2007)............................................................... 8, 25

*Zindel as Tr. for David Zindel Tr. v. Fox Searchlight Pictures, Inc.*,
    815 F. App'x 158 (9th Cir. 2020)........................................................................ 11

**Statutes**

17 U.S.C. § 411(a) ........................................................................................................ 9

DEFENDANTS' MOTION TO DISMISS AND SUPPORTING MEMORANDUM OF POINTS AND AUTHORITIES

# I.    INTRODUCTION

Plaintiff Renzie Wilson Price seeks to recover one billion dollars in damages based on the meritless contention that he is entitled to assert copyright ownership over widely used literary ideas, such as lighting storms, lake houses, and children with superpowers raised by single parental figures.

Plaintiff alleges that Defendant Netflix, Inc.'s ("Netflix") television series *Raising Dion* and the comic book and short film on which it is based infringe the (unregistered) copyright held in his novel, *December's Eve – The Novel by Renzie* ("*December's Eve*" or the "Novel").  Plaintiff alleges that the comic book, short film, and television series (collectively, "*Raising Dion*") are substantially similar to his Novel based on stock ideas over which Plaintiff cannot claim protection, along with a series of random, trivial similarities.  Apart from those unprotectable alleged similarities, an examination of the works reveals that they are radically different.  Even Plaintiff concedes as much, alleging that Defendants "capriciously changed the overall plot" of his Novel before publishing *Raising Dion*.  Complaint ("Compl.") at 5.

*December's Eve* is the story of the biblical Eve reincarnated and living in 1960s rural Alabama, on a murder spree as vengeance for being deemed the embodiment of sin.  Disguised as a midwife, she secretly delivers and then kidnaps a local triplet boy with the ability to create fire, conceals him from his family for years, and tries to exploit his powers to commit mass murder.  Eve violently kills scores of innocent people, and the Novel concludes with the massacre of local townspeople in Eve's garden.

By contrast, *Raising Dion* is a modern-day superhero mystery that focuses on how a single mother navigates her young son's development of superhuman abilities shortly after his father is killed by a mysterious storm.  In the process, the characters seek to uncover the source of Dion's powers and how they are linked to the death of Dion's father—all while navigating subplots of racial discrimination, the difficulties of fitting in with peers as a young child, and the special bond between mother and son.

Plaintiff failed to register his Novel prior to filing suit, and no amount of

1

repleading could ever change the fact that the allegedly infringing works are not substantially similar in protectable expression to his Novel as a matter of law. Plaintiff's claim is specious and should be dismissed under Rule 12(b)(6) with prejudice.

## II.    BACKGROUND

### A.    *Plaintiff's Novel:* **December's Eve – The Novel by Renzie**

Plaintiff, who is in *pro per*, self-published the Novel in July 2010. The Novel is set in rural Alabama during the 1960s. FAC at 11.[1] It focuses on a reincarnation of the biblical Eve, disguised as a harmless midwife named "Ms. Evelynn." Ex. 1 at 8–11, 30–31, 46–47. Eve survived for thousands of years by consuming a potion that acted as a "fountain of youth." *Id.* at 24–25, 38–39, 46–47. She seeks revenge on mankind for treating her as the embodiment of sin by committing mass murder and becoming "The Mother of All the Dead." *Id.* at 18–19, 24–25, 38–39. She kidnaps a triplet boy named Ignis at birth after delivering him at his parents' home. *Id.* at 1–3, 5–6, 8–11, 17–19. Eve tells Ignis she adopted him from an orphanage, instructs him to refer to her as "Aunt Evelyn," and attempts to gain his trust and loyalty. *Id.* at 27–29. Eve knows that Ignis has the superhuman ability to control fire, which she plans to exploit for murder—starting locally and ending with all of mankind. *Id.* at 18–19, 24–26, 41–42.

When Ignis is six years old, he meets his triplet brothers, Vartis and Telekis, both of whom also have superhuman abilities. *Id.* at 27, 30–35. Telekis has telekinesis and Vartis can read minds due to being "born with the Word of God inside [him]." *Id.* at 34. Guided by visions from God, the three boys learn that they are brothers, that Eve kidnapped Ignis at birth and hid him from his family for years, and that Eve is plotting to destroy mankind and create a garden out of its ashes. *Id.* at 33–35, 50–55, 75–76. To thwart Eve's plot, the triplets steal a golden box containing Eve's soul and immortality potion and plan on using the box to district Eve while Ignis sets fire to her

---

[1] For purposes of this Motion, Defendants accept the factual allegations in the operative FAC, except for those contradicted by documents incorporated therein, *i.e.*, the works. *See generally* Johnson Decl. (enclosing the works).

and her garden. *Id.* at 61–62, 65–69, 73–78, 112–13, 178–79, 202–03.

Eve nonetheless succeeds in committing a series of vicious crimes. After realizing that Ignis is on to her, Eve drugs him with poisoned milk and throws his unconscious body into a dungeon that leads to a "pit of hell" underneath her home. *Id.* at 110–12, 114–16. Eve also kidnaps his father, Mr. Adam, whom she believes to be a reincarnated biblical Adam. *Id.* at 102–03, 125–28. Eve throws him into the pit, where he meets Ignis, learns that Ignis is his son, and commits to helping them escape. *Id.* at 129–32, 164–69. Despite the triplets' best efforts, Eve succeeds in murdering a pastor, a sheriff, a deputy sheriff, a judge, a businessman, and scores of innocent townspeople who are lured into her garden by an advertised "Open Field Day," only to be violently killed. *Id.* at 117–20, 120–21, 160–64, 171–72, 176–77, 187–90, 192, 201–07. The Novel concludes with the triplets and their father facing off against Eve. *Id.* at 202–06. The brothers join hands and recite the word of God to defeat Eve's "evil spirits." *Id.* at 207. Ignis then sets Eve's property on fire, while Telekis moves the golden box in the air to catch Eve's attention. *Id.* at 209. Eve desperately chases the box, only to be consumed by Ignis's flames. *Id.* at 209–10. She dies screaming: "*CAIN!*" *Id.* at 210.

### B.    *The* Raising Dion *Comic Book*

Defendants Dennis Liu and Jason Piperberg published the *Raising Dion* comic book (the "Comic Book") in 2015. *See* Johnson Decl., Ex. 2, at 1; FAC at 6. The Comic Book depicts the difficulties that a young mother, Nicole, experiences as she struggles to raise her son, Dion, while navigating the mystery of his developing superpowers. Nicole helps Dion master his abilities, which include telekinesis, invisibility, and the ability to produce ice. Ex. 2 at 4–5. The Comic Book reveals that Dion's powers are rooted in a trip that his mother and father, Mark Warren, took in 2010. Mark worked as a "top engineer" at a biotech firm called Biona, where he met Nicole (a former Biona receptionist) in 2009. *Id.* at 5–7. The two fell in love and celebrated Valentine's Day at a remote cabin to view a solar storm. *Id.* at 10–12. An unusual streak appeared during the storm, prompting Mark and Nicole to go outside to look. *Id.* at 14–15. Mark

approached the streak and became consumed by it, while Nicole fainted.  *Id.* at 18–19.

The next morning, Mark realized that he had the power to turn invisible.  *Id.* at 21.  He concealed his superhuman ability from Nicole to avoid worrying her.  *Id.* at 22–23.  Shortly afterwards, Nicole revealed to Mark that she was pregnant.  *Id.* at 24.

### C.    *The* Raising Dion *Short Film*

Plaintiff alleges that Liu created the *Raising Dion* short film in 2015.  FAC at 10.  The short film is publicly available on YouTube with a run time of approximately 2 minutes and 39 seconds.    Johnson Decl. ¶ 7;  *see also*  "Raising Dion," https://www.youtube.com/watch?v=dW9EIxEqrJw (last accessed February 14, 2022) ("Short Film").  It depicts a loving, single mother's efforts to raise her son, Dion, as he learns to control his superhuman abilities.  The short film mentions that Dion's father passed away from unexplained causes and shows the mother relying on a family friend, "Pat," for support in the wake of her husband's death.  *Id.* at 1:03–33.

### D.    *The* Raising Dion *Television Series*

The 2019 *Raising Dion* television series (the "Series") is a drama based on the premise of the Comic Book.  *See* Johnson Decl., Ex. 3; *see also* FAC at 5.  The Series is set in present-day Atlanta and focuses on the efforts of a single mother, Nicole, to raise her seven-year-old son, Dion, after her husband, Mark Warren, dies. Ex. 3, Ep. 1, at 1:36–4:35, 15:42–16:34, 27:06–28:57.  Nicole soon realizes that Dion is developing superpowers such as telekinesis and invisibility.  *Id.* at 21:38–24:04.  She enlists the help of a family friend, Pat, to help Dion learn to control his powers while Nicole tries to discover their source.  *Id.* at 11:12–13:21; Ep. 3 at 0:22–3:30.  Pat is an engineer at "Biona," the biotech company where Mark worked.  *Id.*, Ep. 2 at 14:34–16:18; Ep. 4 at 4 at 2:54–4:20.  Nicole and Pat's attempts to teach Dion to control his powers do not go smoothly.  *Id.*, Ep. 1 at 21:38–24:04, 35:01–37:14; Ep. 2 at 19:37–23:06.  Dion frequently causes problems in public—including by unintentionally stealing Twix candy bars from a store and by nearly getting hit by a car when Dion teleports suddenly into the middle of a busy road.  *Id.*, Ep. 2 at 16:30–17:52, 35:36–36:27.

4

The series reveals that Mark died in a mysterious storm after saving a woman named Charlotte Tuck. *Id.*, Ep. 1 at 15:42–16:34, 27:06–28:57. Nicole learns that Charlotte had visited Iceland in 2010 to view a solar storm called the "Aurora event," while Mark and Pat were there studying the storm for Biona. *Id.*, Ep. 3 at 27:17–28:48, 32:14–33:55. Charlotte developed the ability to become invisible after the storm, and later learned that other observers like Mark were experiencing similar phenomena. *Id.* at 27:17–28:48, 32:14–33:55. When Nicole tells Pat what she has learned, he expresses surprise and speculates that he must have failed to develop abilities because he observed the entire solar storm from inside a yurt without traveling outside. *Id.* at 39:19–41:45.

Charlotte also reveals to Nicole that there was a "thing in the storm" that killed Mark. *Id.* at 32:14–33:55, 37:13–39:09, 46:05–49. Nicole and Dion eventually encounter the "thing" themselves, which Dion names the "Crooked Man." *Id.*, Ep. 5 at 38:53–40:06; Ep. 6 at 14:15–15:49. Nicole discovers that the Crooked Man has been finding and killing witnesses to the Aurora event. *Id.*, Ep. 3 at 32:14–33:55; Ep. 6 at 19:57–; Ep. 7 at 0:27–2:39; Ep. 8 at 23:28–26:28. Charlotte tells Nicole that she has gone into hiding for her safety and advises Nicole that the Crooked Man is too powerful to defeat. *Id.*, Ep. 3 at 27:17–28:48, 32:14–33:55; Ep. 6 at 19:57–22:05.

Meanwhile, Dion's developing powers attract the attention of Biona executives, who become suspicious when Dion tours Biona with Pat. *Id.*, Ep. 4 at 12:53–16:08, 42:11–42:33; Ep. 5 at 11:26–13:08; Ep. 6 at 16:00–19:39. Dion uses his powers to shut down Biona's security cameras so he and Pat can break into a top-secret laboratory that houses Icelandic animals and plants that became diseased after the Aurora event, and Dion discovers a healing power enabling him to cure a sick fox. *Id.*, Ep. 4 at 22:31–31:36, 33:42–36:22. Biona's executives spy on Dion and Nicole. *Id.*, Ep. 6 at 47:27–48:15; Ep. 8 at 9:04–27. The company eventually kidnaps Dion from a local hospital, where Dion is recovering from a failed attempt to use his powers to heal Pat, who suffers from frequent migraines. *Id.*, Ep. 4 at 2:54–4:20; Ep. 7 at 4:59–6:04, 8:01–9:33, 17:17–18:19, 24:06–28:20, 46:27–47:07. After a tense standoff with a Biona executive, Nicole

convinces Biona to release Dion in exchange for her agreement to give them Mark's personal research on the Aurora event. *Id.*, Ep. 8 at 0:21–7:37.

Pat becomes jealous of Nicole's romantic attachment to a different man, prompting Nicole to break ties with him. *Id.*, Ep. 8 at 36:42–39:30. Charlotte, who has become Dion's teacher and second guardian, uses her powers to prevent Pat from accessing Dion and Nicole's apartment building. *Id.*, Ep. 6 at 19:57–26:05; Ep. 8 at 40:55–42:28. Pat recognizes Charlotte's abilities and reveals that he is the Crooked Man. *Id.*, Ep. 8 at 42:28–43:59. Pat explains that he had in fact left the yurt during the solar storm and developed a serious illness as a result. *Id.*, Ep. 9 at 0:51–5:43. The disease drove him to kill other storm observers (including Mark), as consuming their powers slowed the disease's progression. *Id.*, Ep. 9 at 2:57–5:39. Pat kills Charlotte, and reveals his true identity to Nicole. *Id.*, Ep. 8 at 40:55–42:28; Ep. 9 at 19:37–20:58.

Nicole and Dion fight Pat near a science fair at Dion's school. *Id.*, Ep. 9 at 27:19–37:24. With the help of Mark's ghost, Nicole and Dion drive a lightning rod into Pat's body and funnel Dion's energy into it. *Id.* at 33:21–37:06. Mark's ghost manifests and warns Nicole and Dion that the Crooked Man likely survived and will assume another form. *Id.* at 37:33–39:48. The Series ends by revealing that the Crooked Man has possessed a young farm boy named "Brayden," the son of an Aurora-event observer killed earlier in the Series. *Id.*, Ep. 4 at 0:30–2:39, 45:00–47:47; Ep. 9 at 41:11–42:11.

The Series features numerous subplots, including the bullying Dion faces trying to fit in with his peers, *id.*, Ep. 1 at 4:29–5:55, 6:51–7:32; Ep. 6 at 2:53–4:17; racial discrimination, *id.*, Ep. 2 at 15:10–21:48; Ep. 3 at 41:52–45:38; Dion's friendship with Esperanza, *id.*, Ep. 1 at 7:27–8:42; Ep. 2 at 30:14–32:19; Ep. 8 at 35:16–36:28; struggles that Nicole faces as a single mother, *id.*, Ep. 1 at 1:27–4:34; Ep. 2 at Ep. 2 at 16:30–23:12; the at-times difficult relationship between Nicole and her more successful sister, *id.*, Ep. 1 at 24:40–26:44; Ep. 3 at 20:21–22:03; Ep. 4 at 5:46–7:47; Ep. 7 at 24:06–28:20, 46:27–47:07; and Biona's possible involvement in the Aurora event and the superhuman abilities it apparently caused, *id.*, Ep. 6 at 45:34–47:21; Ep. 7 at 3:41–5:06.

###### E.    Plaintiff's Action

Plaintiff filed this action in the Northern District of Alabama.  *See* Compl. at 1.
That court approved a joint stipulation between Plaintiff and several Defendants setting
a February 14, 2022 response deadline.  *See* Order, R.22, at 1.  The Northern District of
Alabama granted Plaintiff's motion to transfer the case to this District on January 3,
2022, and the action was transferred on January 31, 2022.

Plaintiff asserts a copyright infringement claim against those allegedly
responsible for creating *Raising Dion*.  In his original Complaint, he claimed
Defendants "capriciously changed the overall plot" of his Novel.  *Id.* at 5, 8–10.
Plaintiff filed his FAC on November 29, 2021, adding purported similarities between
Defendants' works and his Novel, and claiming he "registered a copyright,
Copyright©2010Renzie." *Id.* at 7.[2]  Searches on the Copyright Office's Official Public
Catalog, however, show that he did not.  *See* Johnson Decl. ¶¶ 5–6.

### III.    LEGAL STANDARD

Dismissal is appropriate under Rule 12(b)(6) "where the complaint lacks a
cognizable legal theory or sufficient facts to support a cognizable legal theory."
*Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008).  While
courts must generally accept the complaint's plausible allegations as true, they "need
not accept as true allegations that are contradicted by documents referenced in the
complaint." *White v. Twentieth Century Fox Corp.*, No. CV11-01987 SJO(SHx), 2012
WL 13008330, at *2 (C.D. Cal. Apr. 11, 2012) (quoting *Steckman v. Hart Brewing,
Inc.*, 143 F.3d 1293, 1295–96 (9th Cir. 1998)).  Courts properly take judicial notice of
the plaintiff's work and the allegedly infringing work where the works form the basis
of the claim and are referred to extensively in the complaint.  *Fillmore v. Blumhouse*

---

2 On December 1, 2021, Plaintiff moved for leave to file a proposed Second Amended
Complaint ("SAC") to make a minor spelling correction and add allegations to the
Statement of Facts.  R.13, at 1.  Plaintiff has not calendared that motion for leave in this
Court, and, for the reasons set forth herein, any amendment would be futile.

1   *Prods., LLC*, 771 F. App'x 756 (9th Cir. 2019); *see also Ricketts v. CBS Corps.*, 439 F.

2   Supp. 3d 1199, 1212 & n.4 (C.D. Cal. 2020) (taking notice of the literary works at issue

3   and dismissing *pro se* complaint for lack of substantial similarity); *Shame on You*

4   *Prods., Inc. v. Elizabeth Banks*, 120 F. Supp. 3d 1123, 1144 (C.D. Cal. 2015) ("Because

5   these works are referenced in—although not attached to—the amended complaint, they

6   are incorporated by reference in it, and can be considered by the court in assessing

7   substantial similarity."); *Zella v. E.W. Scripps Co.*, 529 F. Supp. 2d 1124, 1131 (C.D.

8   Cal. 2007) (citation omitted) (same); *Mills v. Netflix, Inc.*, No. CV 19-7618-CBM-

9   (AGRx), 2020 WL 548558, at *2 (C.D. Cal. Feb. 3, 2020) (taking judicial notice of

10  YouTube video and other works that were incorporated by reference into complaint).

11  **IV.   ARGUMENT**

12      To succeed on a copyright infringement claim, a plaintiff "must demonstrate

13  (1) ownership of a valid copyright, and (2) copying of constituent elements of the work

14  that are original." *Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1076

15  (9th Cir. 2006) (cleaned up).  In the absence of direct evidence of copying, the plaintiff

16  may satisfy that element with "fact-based showings that the defendant had 'access' to

17  the plaintiff's work and that the two works are 'substantially similar.'" *Id.*[3]

18

19  [3] On this Motion, Defendants do not challenge Plaintiff's access allegations (which they

20  deny).  A review of the FAC (and proposed SAC), however, demonstrates that Plaintiff
    will be unable to prove access.  Access requires him to "show a reasonable possibility,

21  not merely a bare possibility, that an alleged infringer had the chance to view the
    protected work." *Art Attacks Ink, LLC v. MGA Entm't Inc.*, 581 F.3d 1138, 1143 (9th

22  Cir. 2009).   Without direct evidence, a plaintiff may only rely on circumstantial

23  evidence to prove access by "(1) establishing a chain of events linking the plaintiff's
    work and the defendant's access, or (2) showing that the plaintiff's work has been

24  widely disseminated." *Loomis v. Cornish*, 836 F.3d 991, 995 (9th Cir. 2016).  Here,
    Plaintiff does not allege any chain of events tying Defendants to his Novel, and his bare

25  allegations that the Novel was available for sale online are insufficient to establish wide

26  dissemination. *See, e.g.*, *Rice*, 330 F.3d at 1178 (no widespread dissemination where
    plaintiff "sold approximately 17,000 copies [of his work] between 1986 and 1999");

27  *Clanton v. UMG Recordings, Inc.*, 2021 WL 3621784, at *3 n.2 (S.D.N.Y. Aug. 16,

28  2021) (work's availability on YouTube was insufficient for access).

The substantial similarity analysis involves two tests: (1) an extrinsic test, which rests on "an objective comparison of the two works" that requires the court to consider "whether the works share a similarity of ideas and expression as measured by external, objective criteria"; and (2) an intrinsic test, which "requires a subjective inquiry into whether a reasonable audience would recognize the allegedly infringing work as a dramatization of the plaintiff's creation." *Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1059 (C.D. Cal. 2010). "Only if the extrinsic analysis succeeds does the so-called 'intrinsic' analysis takes place." *Corbello v. Valli*, 974 F.3d 965, 974 (9th Cir. 2020). Under the extrinsic test, the court must examine whether there are "articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events in the two works." *Id.* at 975 (citation omitted). Only protectable expression may be considered; unprotectable elements such as ideas, scenes-a-faire, and "[f]amiliar stock scenes and themes" must be disregarded. *Benay v. Warner Bros. Entm't, Inc.*, 607 F.3d 620, 624–25 (9th Cir. 2010), *overruled on other grounds by Skidmore v. Zeppelin*, 952 F.3d 1051 (9th Cir. 2020); *see also Cavalier v. Random House, Inc.*, 297 F.3d 815, 822 (9th Cir. 2002). Substantial similarity "requires a similarity of expression, not ideas," with the "key question" focusing on whether the works are "substantially similar beyond the fact that they depict the same idea." *Mattel, Inc. v. MGA Entm't, Inc.*, 616 F.3d 904, 917 (9th Cir. 2010).

Plaintiff's claim fails for two independent reasons: (1) he did not register his Novel with the Copyright Office prior to filing his infringement claim, as required by 17 U.S.C. § 411(a); and (2) an examination of the works at issue reveals that they are not substantially similar with respect to any protectable element.

### A.    *Plaintiff's Claim Fails Because He Did Not Register His Novel*

Before pursuing an infringement claim in court, a plaintiff "must comply with § 411(a)'s requirement that 'registration of the copyright claim has been made.'" *Fourth Est. Pub. Benefit Corp. v. Wall-Street.com, LLC*, 139 S. Ct. 881, 887 (2019) (quoting 17 U.S.C. § 411(a)). Registration "is akin to an administrative exhaustion

requirement that the owner must satisfy before suing to enforce ownership rights." *Id.*
at 886–87.  Registration occurs when the Copyright Office registers a copyright.  *Id.*

Plaintiff has not satisfied that requirement here.  While Plaintiff alleges that he
"registered a copyright," he does not provide a registration number for his work and
instead cites only to the copyright that appears in the published Novel.  *See* FAC at 7
("I also registered a copyright, Copyright©2010Renzie.").  The federal copyright
register does not reflect the registration of any work that is either entitled *December's
Eve* or by "Renzie Wilson Price."  Johnson Decl. at Exs. 5–6.  This defect is fatal;
Plaintiff cannot remedy the registration deficiency by registering the work and then
amending the operative complaint.  *See Washoutpan.com, LLC v. HD Supply
Construction Supply Ltd.*, No. 2:19-cv-00494-AB (JEMx), 2019 WL 9050859, at *2–3
(C.D. Cal. Aug. 5, 2019) ("Several district courts . . . conclude that permitting
amendment to cure a claimant's failure to register its copyright before suing would
undermine the Supreme Court's decision in *Fourth Estate*.") (internal quotation marks
omitted).  His claim should be dismissed.  *See id.*; *Kiely v. Universal Music Grp.*, No.
CV 19-4826-MWF, 2020 WL 4037161, at *3 (C.D. Cal. Mar. 5, 2020) (dismissing
action where plaintiff did not sufficiently allege registration of a copyright).

### B.    Plaintiff's Claim Fails for Lack of Substantial Similarity

#### 1.    Dismissal for Lack of Substantial Similarity is Appropriate at the 12(b)(6) Stage

The Ninth Circuit has confirmed that a court can dismiss a copyright infringement
claim based on lack of substantial similarity under the extrinsic test where, as here, the
copyrighted and allegedly infringing works are presented to the court, such that they are
"capable of examination and comparison," and "[n]othing disclosed during discovery
could alter the fact that the allegedly infringing works are as a matter of law not
substantially similar."  *Rentmeester v. Nike, Inc*., 883 F.3d 1111, 1123 (9th Cir. 2018),
overruled on other grounds by *Skidmore*, 952 F.3d 1051; *see also Masterson v. Walt
Disney Co*., 821 F. App'x 779, 780 n.1 (9th Cir. 2020) (collecting ten cases).  The Ninth

Circuit has repeatedly affirmed dismissals with prejudice of copyright infringement actions involving literary works, where the works at issue are so dissimilar as to render allegations of infringement implausible. *See, e.g.*, *Masterson*, 821 F. App'x at 781; *Fillmore v. Blumhouse Prods., LLC*, 771 F. App'x 756, 756–57 (9th Cir. June 7, 2019); *Esplanade Prods., Inc. v. Walt Disney Co*., 768 F. App'x 732, 734 (9th Cir. Apr. 24, 2019); *Abdullah v. Walt Disney Co*., 714 F. App'x 758, 758–59 (9th Cir. Mar. 8, 2018); *Silas v. Home Box Office, Inc*., 713 F. App'x 626, 627 (9th Cir. Feb. 22, 2018).

This is because where, as here, the court's "judicial experience and common sense" is more than sufficient to identify and filter out widely used, stock elements unprotectable elements, expert testimony is unnecessary. In *Masterson*, for example, the court granted a motion to dismiss with prejudice an action alleging that Disney's film *Inside Out* infringed the plaintiff's copyright in a book, which, like the film, involved anthropomorphized feelings that helped a child manage her emotions. Without the need for expert testimony, the court concluded that the shared theme that "every feeling has a reason," shared plot of "a journey through childhood emotions," and shared "cloud-like character[s] that talk[]" were too general to be protectable under the extrinsic test; and that "the presence of anthropomorphized emotion characters flows from the premise of doing a children's story about human emotions, making it unprotectable scenes-a-faire." *See Masterson*, 821 F. App'x at 781-82.

The works here are so drastically dissimilar, even as to their *un*protectable elements, there is no question that expert testimony is unnecessary to determine whether any purported similarities "are qualitatively significant." *Cf. Alfred v. Walt Disney Co*., 821 F. App'x 727, 729 (9th Cir. 2020) (holding expert testimony would be useful "where the works in question are almost twenty years old and the [allegedly infringing work] may itself have shaped what are now considered . . . tropes" of the genre); *Zindel as Tr. for David Zindel Tr. v. Fox Searchlight Pictures, Inc*., 815 F. App'x 158, 159–60 (9th Cir. 2020) (where plaintiff "plausibly alleged" a shared plot sequence and other similarities in protectable expression, expert testimony would aid in determining the

extent and qualitative importance of the alleged similarities).  An examination of the works shows that *December's Eve* is radically different from *Raising Dion*, and—to the extent there are any trivial similarities—the Court's judicial experience and common sense is enough to conclude that they are unprotectable.

### 2.    The Allegedly Infringing Works Are Not Substantially Similar in Protectable Expression to Plaintiff's Novel

#### (a)    Plot and Sequence of Events

"General plot ideas are not protected by copyright law."  *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir. 1994).  Plaintiff's primary substantial similarity argument is that the works tell stories involving children with superpowers—but that is an unprotectable stock idea that has been used in countless fictional works as wide-ranging as *The Darkest Minds* (2018), *Spider-Man: Into the Spider-Verse* (2018), *Heroes* (2010), *Sky High* (2005), *The Incredibles* (2004), and *Matilda* (1996).  The same holds true for the idea of a superhuman child being raised or protected by a single parental figure, which has also widely featured in literary works. *E.g.*, *Logan* (2017); *Heroes* (2010); *Spider-Man* (2002).  Infringement claims cannot be based on such stock ideas.  *See, e.g.*, *Kouf*, 16 F.3d at 1045 (no substantial similarity where "both works involve a life struggle of kids fighting insurmountable dangers, because general plot ideas are not protected by copyright law") (cleaned up); *Cavalier*, 297 F.3d at 824 ("premise of a child, invited by moon-type character, who takes a journey through the night sky and returns safely to bed" constitutes an unprotectable idea); *Carlini v. Paramount Pictures Corp.*, No. 2:19-cv-08306-SB-RAP, 2021 WL 911684, at *9 (C.D. Cal. Feb. 2, 2021) (female lead who "gains the power to hear men's thoughts" is an unprotectable plot idea); *Abdullah v. Walt Disney Co.*, No. 15 Civ. 9581 (SVW)(JPR), 2016 WL 5380930, at *5 (C.D. Cal. Mar. 14, 2016), *aff'd* 714 F. App'x 758 (9th Cir. Mar. 8, 2018) (dismissing action where alleged similarities involved scenes a faire "such as princes, princesses, castles, magical powers, love, betrayal"); *Historical Truth Prods., Inc. v. Sony Pictures Entm't, Inc.*, No. 93 Civ. 5529 (MBM),

1995 WL 693189, at *8 (S.D.N.Y. Nov. 22, 1995) ("[C]haracters with superhuman qualities . . . are unoriginal and uncopyrightable stock elements of the action-adventure and science fiction film genres.").

Setting aside this unprotectable idea, as the Court must, the plots here could hardly be more different, as Plaintiff conceded in his Complaint. *See* Compl. at 5 (alleging that Defendants "changed the overall plot" of his Novel). *December's Eve* is a biblical revenge tale focusing on a 1960s-reincarnation of Eve who plots to annihilate the human race. Ex. 1 at 8–11, 18–19, 24–25. Key plot points include Eve committing kidnappings, the murders of several officials, and a garden massacre. *Id.* at 102–03, 110–16, 125–28, 117–20, 160–64, 171–72, 176–77, 187–90, 201–07. By contrast, *Raising Dion* tells the present-day story of a young boy's efforts to control his evolving superhuman abilities while being raised by a fiercely devoted single mother. Ex. 3, Ep. 1 at 27:06–28:57; Ep. 3 at 3:54–5:01; Ep. 4 at 43:06–44:55; Ep. 8 at 0:21–7:40.

Eve's obsession with vengeance for the betrayal she feels at being depicted as the source of sin drives the plot in *December's Eve*, whereas the conflict in the Series arises from Pat's effort to kill others with superhuman abilities to ward off his disease. *Id.*, Ep. 9 at 3:13–5:41. *Raising Dion* is even more different on this score, as none of the versions has a vengeance-driven plotline at all. *Cf. Historical Truth*, 1995 WL 693189, at *8 (no substantial similarity where protagonist of one work is driven by vengeance whereas the protagonist of the other is not). Neither the Short Film or Comic Book so much as mentions an antagonist. And the Series focuses on how Mark developed the ability to become invisible and passed his superpowers to his son before being killed by a mysterious entity (the Crooked Man), whose actions turn out to be driven by survival rather than revenge. Ex. 3, Ep. 3 at 22:45–24:41, 32:14–33:55, 37:13–39:09, 46:05–49; Ep. 9 at 3:13–5:41, 17:22–20:35. Even as to the kids' superpowers, the works are very different. The triplets in *December's Eve* appear to have acquired their superpowers from God, Ex. 1 at 34, whereas Dion inherited his abilities from his father after a solar storm in Iceland, Ex. 3, Ep. 3 at 37:13–39:09. *Cf. Carlini*, 2021 WL 911684, at *10 (no

13

similarity where characters acquired supernatural abilities from different sources).

*Raising Dion* also features subplots entirely absent from *December's Eve*, further undermining substantial similarity. *See Gilbert v. New Line Prods., Inc.*, 2009 WL 7422458, No. CV 09-02231 RGK (RZx) at *4 (C.D. Cal. Nov. 16, 2009). For example, the Short Film alludes to Mark's premature death. Short Film at 1:03–33. The Comic Book includes the story of how Nicole and Mark met, illustrations of the mysterious solar storm that caused Mark to develop invisibility, and depictions of Nicole's attempts to teach a young child how to control his superhuman abilities. Ex. 2 at 4–5, 6–9, 14–21. And the Series' subplots include the Aurora event's impact on Mark and the other observers, Ex. 3, Ep. 3 at 27:17–28:48, 32:14–33:55; whether Biona was somehow involved in orchestrating the event, *id.*, Ep. 6 at 45:34–47:21; the challenges that Nicole faces as a single mother and her sacrifice to leave professional dancing, *id.*, Ep. 4 at 17:16–24:06; Ep 5 at 13:57–16:40; Dion's struggles with belonging, *id.*, Ep. 1 at 4:29–5:55, 6:51–7:32; Ep. 6 at 2:53–4:17; Dion's efforts to understand racial discrimination and the importance of respecting Esperanza's autonomy, *id.*, Ep. 2 at 15:10–21:48; Ep. 3 at 41:52–45:38; Ep. 8 at 40:55–41:44; the characters' efforts to uncover a scientific explanation for Dion's abilities, *id.*, Ep. 6 at 45:34–47:21; Ep. 7 at 3:41–5:06; and the conflict that Nicole experiences about whether to rely on Biona to protect Dion from the Crooked Man, *id.*, Ep. 8 at 0:21–7:37; Ep. 9 at 26:14–27:13. None of these subplots has a counterpart in *December's Eve*. And the central plotlines of the Novel—Eve's reincarnation, her vengeance-driven murder spree, and the triplets' efforts to stop her—are absent from *Raising Dion*. *See* Ex. 1 at 8–11, 18–25, 30–31, 46–47, 207–10.

Finally, there can be no substantial similarity in the sequence of events, given the events are wholly dissimilar. Moreover, *December's Eve* unfolds chronologically, but the Comic Book and Series rely on flashbacks to depict key events. *See* Ex. 3, Ep. 5 at 22:45–26:38; *Funky Films*, 462 F.3d at 1081 (one work's use of linear chronology

versus another's use of flashbacks undermines substantial similarity).[4]

Despite conceding their plots are ***not*** the same, Compl. at 5, Plaintiff cherry picks examples of supposed similarities. But, as set forth below, these alleged similarities are inaccurate and/or unprotectable. *See Lichtfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984) (random lists of similarities are "inherently subjective and unreliable," especially where "the list emphasizes random similarities scattered throughout the works"); *Silas v. Home Box Office, Inc.*, 201 F. Supp. 3d 1158, 1183 (C.D. Cal. 2016) (no substantial similarity where a review of the works "reveals very different stories, and [the p]laintiff's compilations of random similarities scattered throughout the works are insufficient *scenes a faire*") (quotation omitted)).

***Young Child Raised by Single Black Woman.*** Plaintiff claims that the works feature a Black child being raised by a single, Black woman. FAC at 7–8. The idea of a single Black woman raising a Black child, however, is too generic to be protectable. *Cf. Astor-White v. Strong*, No. CV 15-6326 PA, 2019 WL 3017684, at *2 (C.D. Cal. June 14, 2019) (no substantial similarity as a matter of law where works include a young child who becomes consumed by the "fast life" and goes on to date an older partner), *aff'd by* 817 F. App'x 502 (9th Cir. Aug. 21, 2020) (Mem.); *Cline v. Reetz-Laiolo*, 329 F. Supp. 3d 1000, 1040 (N.D. Cal. 2018) (commonalities such as "an alienated youth, in the care of a single parent" are unprotectable stock elements). And the expression of

---

4 Courts have found plots with far more similarities to be dissimilar as a matter of law. *See, e.g.*, *Funky Films*, 462 F.3d at 1081 (works were not substantially similar despite sharing plot elements such as "the family-run funeral home, the father's death, and the return of the 'prodigal son,' who assists his brother in maintaining the family business"); *Cavalier*, 297 F.3d at 824 (no substantial similarity even though both works "share the general premise of a child, invited by a moon-type character, who takes a journey through the night sky and returns safely to bed to fall asleep"); *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985) (no substantial similarity where both works "deal with criminal organizations that murder health young people, then remove and sell their vital organs to wealthy people in need of transplants"); *Carlini*, 2021 WL 911684, at *10 (no substantial similarity where both works were "centered around the same major plot device: the female lead gains the power to hear men's thoughts").

that idea is wholly distinct in the works.  Eve is a murderous reincarnation of the biblical Eve, who kidnaps Ignis at birth to facilitate her murderous plot.  Ex. 1 at 18–19, 24–25, 38–39.  She is ***not*** Ignis's mother (nor does she purport to be) and does not act in his best interests.  Far from it: Eve kidnaps Ingis, drugs him with poisoned milk, throws him into a dungeon that leads to a pit of hell along with the bodies of her victims, and plots to exploit his abilities to commit mass murder.  *Id.* at 24–25, 38–39, 110–16, 201–07.  Nicole, in stark contrast, is a loving, devoted mother seeking to protect Dion and help him learn to master his gifts, while navigating the grief of losing Dion's father and balancing work and family as a single parent.

***Absent Fathers.***  Next, Plaintiff alleges that the works are substantially similar because they include "absent fathers."  FAC at 8.  Plaintiff is wrong.  Ignis's father is not "absent"; Ignis is kidnapped from him.  Ex. 1 at 8–19.  And the two are eventually reunited when Ignis's father vows to help him escape from Eve and rejoin his family.  *Id.* at 129–32, 164–69.  In contrast, Dion's father was murdered by the Crooked Man before the Series begins, and is shown in flashbacks as loving and devoted.  Ex. 3, Ep. 1 at 27:06–28:57; Ep. 5 at 22:45–26:38, 32:35–36:07.[5]  Even if the works all had "absent fathers," which they do not, that is an unprotectable stock idea.  *Cf. Funky Films*, 462 F.3d at 1081 (general plot ideas, like father's death, are not protectable).

***Birthday-Party Scenes.***  Plaintiff compares the birthday party Eve throws for Ignis to a starkly different birthday party that Nicole throws for Dion.  FAC at 8.  Eve celebrates Ignis's birthday by giving him lavish gifts as a ploy to gain his trust so that she can manipulate him into using his superhuman abilities to murder others.  Ex. 1 at 29–30.  Nicole, by contrast, throws Dion a joint birthday party with his friends out of genuine love.  Ex. 3, Ep. 5 at 10:00–10:30.  And unlike Eve, Nicole is unable to afford "lavish" gifts for Dion. The birthday party proves difficult for Nicole, who unexpectedly

---

[5] The Short Film and Comic Book allude to Mark's death without explaining how he died.  *See* Ex. 2 at 4–5; Short Film at 1:03–33.

has to work a shift at a new job just before Dion's party. *Id.* at 10:00–11:19, 21:30–22:26. Dion's party also develops subplots that are entirely absent from the Novel, such as his decision to reveal his gifts to Esperanza and Biona's discovery of his powers. *Id.* at 28:17–30:48. In any event, the generic idea of a birthday party in a story involving children is another example of an unprotectable stock idea. *Cf. Benay*, 607 F.3d at 628 (commonalities that flow from an unprotected premise are *scenes a faire*).

**Vine Scenes.** Plaintiff's reliance on the depiction of "huge vines that covered things and devour people" fares no better. FAC at 9. In the Novel, Eve uses her magical ability to control the vines that surround her house and garden to brutally murder trespassers. Ex. 1 at 117–20, 120–21, 160–64, 171–72, 176–77, 187–90, 192, 201–07. By contrast, Walter Mills—a farmer who developed the ability to control vegetation in the wake of the Aurora event—induces vines to cover his home to *protect* his son from the Crooked Man shortly before being murdered. Ex. 3, Ep. 4 at 45:00–47:47. The vines in the Series do not "devour" anyone. *Id.* The two scenes have nothing in common apart from the fact that both characters can make vines grow. But that is another stock element that has been featured in other literary works, such as *Sky High*, and is not protectable. *See Funky Films*, 462 F.3d at 1078 (generic similarities will not save a plaintiff where "the plots of the two stories develop quite differently").

**Levitation Scenes.** Plaintiff also argues that the works are similar because they include scenes in which a superhuman child levitates another character—Cat in the Novel, and Esperanza in the Series—who demands to be put down. FAC at 9. This comparison, too, fails. In *December's Eve*, Telekis reveals his abilities by repeatedly lifting his mother's teenage cousin, Cat, in the air. Ex. 1 at 6, 149–50. Dion does not levitate Esperanza to reveal his superpower, but rather as a misguided attempt to help his friend who uses a wheelchair walk. Ex. 3, Ep. 8 at 35:16–36:28. Cat does not "demand to be put down," but rather finds the levitation experience exhilarating and soon asks to be lifted up again, Ex. 1 at 150; whereas Esperanza is offended by the experience and departs angrily, Ex. 3, Ep. 8 at 35:51–36:28. The scene is the catalyst

for discussions among Dion, Nicole, and Charlotte about respecting limits and accepting others' authentic selves.  Ex. 3, Ep. 8 at 40:55–41:44; Ep. 9 at 13:25–14:54. Regardless, telekinesis is a stock element of works featuring characters with superhuman abilities, including *X-Men: Dark Phoenix* (2019), *Doctor Strange* (2016), *X-Men* (2000), *The Matrix* (1999), *Matilda* (1996), and *Carrie* (1976).  *See Crawford v. Midway Games Inc.*, No. 07 Civ. 00967 (FMC) (JCX), 2008 WL 11334537, at *7 (C.D. Cal. Dec. 3, 2008) (mere use of "paranormal abilities," including telepathy, telekinesis, clairvoyance, and the ability to manipulate fire, "cannot be protected"). Levitation scenes flow naturally from the idea of a character having superpowers. *Historical Truth*, 1995 WL 693189, at *8 ("characters with superhuman qualities . . . are unoriginal and uncopyrightable stock elements of the action-adventure and science fiction film genres").

***Comic Books.***  Plaintiff claims that the creation of the Comic Book infringed the Novel's reference to the triplets' older brother holding a comic book.  *See* FAC at 8 (citing Ex. 1 at 93 ("The nine year old boy held a used comic book in his hand.")).  That is patently meritless.  Including a stray reference to a comic book does not entitle an author to claim ownership over any comic book that post-dates the work's publication.  The Novel does not provide any detail about the comic book that would make it similar in expression to the *Raising Dion* Comic Book.

***Fireball Scenes.***  Finally, Plaintiff alleges that both the Novel and Series include similar "fireball scene[s]" that allegedly depict Ignis and Dion each wielding a ball of fire.  SAC at 10.  But the scenes are not remotely similar.  The scene in the Novel takes place during Ignis's reunion with his brothers, and the demonstration of his ability helps the trio realize that they are related.  The scene in the Series features no such reunion and instead takes place while Charlotte Tuck is attempting to teach Dion how to control his powers so as to prepare to face the Crooked Man; it also shows Dion wielding a ball of energy, not fire.  Ex. 3, Ep. 6 at 24:23–25:26.  The scenes are only similar insofar as they depict children with superpowers—a generic element of superhero stories that is

not protectable. *See Abdullah*, 2016 WL 5380930, at *5 (no substantial similarity where "the only similarity is that the two works contain a character that has magical ice powers, which is too generic to be afforded copyright protection").[6]

### (b)    Themes

*December's Eve*'s theme also bears no similarity to the theme of *Raising Dion*. *December's Eve* is a revenge story featuring religious themes such as the power of faith in confronting evil and the relegation of Eve (rather than Adam) as the symbol of sin. Ex. 1 at 18–19, 24–25, 33–39.  The theme of religious faith and the power of God pervades the Novel, including with respect to Eve's evident terror of God, the visions from God that enable the triplets to discover and ultimately thwart Eve's plot, and Eve's last word, "*CAIN!*"  *Id.* at 33–39, 50–55, 75–76, 209–10.

Religious themes are entirely absent from the Short Film, Comic Book, and Series, which focus instead on the strong bond between a mother and her son and the challenges and sacrifices of being a single mother—with the Series featuring additional themes including an atypical child's struggles to belong, racial and disability-based discrimination and ethical issues regarding Biona's interventions in Nicole and Dion's lives. *Cf. Marcus v. ABC Signature Studios, Inc.*, 279 F. Supp. 3d 1056, 1068 (C.D. Cal. 2017) (no substantial similarity where the theme of the plaintiff's work was "relying on your faith to help you overcome racism," whereas the defendants' work focused on "staying true to one's heritage," without any religion-based focus).

### (c)    Characters

None of the characters in *December's Eve* is similar to any of the characters in *Raising Dion*.  Plaintiff's attempts to draw parallels are unsupported by the works.

---

[6] In his proposed SAC, Plaintiff asserts that Ignis and Dion encounter similar calming voices, but that allegation also fails.  In the Novel, Ignis hears the voice of God, which is the source of his ability to confront Eve and eventually defeat her.  *See* Ex. 1 at 37. In the Series, the calming voice comes from Dion's deceased father, not God, and Dion's father is able to manifest as a ghost because his energy was consumed by the Crooked Man.  Ex. 3, Ep. 9 at 17:22–20:35, 37:33–39:48.

*Eve and Nicole.* Again, apart from the unprotectable fact that both characters are Black women raising Black boys, there are no similarities between Nicole, who is Dion's loving mother, and Eve, who kidnapped Ignis to further her evil plot and later poisons him and puts him in the "pit of hell." Ex. 1 at 110–12, 114–16.

*Eve and the Crooked Man.* Plaintiff also alleges that Eve is substantially similar to the Crooked Man because both characters use "long, spiney veins" to kill others. FAC at 9. But Eve's "long, spiney veins" are actually her arms, which she uses to murder a judge by dismembering him limb from limb. Ex. 1 at 189–90. By contrast, the Crooked Man creates lightning strikes that kill almost immediately without dismemberment, while he simultaneously feeds on the energy of his victims (who possess supernatural abilities). And the source of the characters' powers is dramatically different, with Eve's powers rooted in her biblical status and access to magical potions, whereas the Crooked Man's powers originated in the Icelandic event.

*A Lightning Storm and the Crooked Man.* Plaintiff then alleges the Crooked Man is actually substantially similar to the lightning storm depicted in the Novel on the night of the triplets' birth. FAC at 9 (citing Ex. 1 at 13). The two are anything but similar. The storm in the Novel is a natural event, not a character, and is not linked to Eve's powers. *See* Ex. 1 at 13. The same cannot be said of the Crooked Man, who is able to create distinctive lightning storms that assume the shape of a large man and exploit them to kill others. *See* Ex. 3, Ep. 3 at 46:05–49; Ep. 4 at 2:51–3:24; Ep. 5 at 32:35–36:07; Ep. 8 at 42:28–43:59. It would also be absurd to allow Plaintiff to claim ownership over the stock idea of a lightning storm—a natural event depicted in countless works. *See Folkens v. Wyland Worldwide, LLC*, 882 F.3d 768, 775 (9th Cir. 2018) ("[I]deas, first expressed in nature, are the common heritage of humankind, and no artist may use copyright law to prevent others from depicting them.") (cleaned up).

*Cat and Kat.* Plaintiff also alleges the character of "Cat" in his Novel is comparable to the "Kat," who appears in the Series (not the Comic Book or Film, as Plaintiff incorrectly alleges). *See* FAC at 7–8. Not so. Cat is the triplets' adolescent

cousin, and her contribution arises from the fact that she witnessed Ignis's delivery shortly before Eve conceals him in her bag and kidnaps him. Ex. 1 at 6, 18–20. Cat's memory of the incident bolsters the credibility of Ignis's triplet brothers near the end of the Novel, when they reveal to their mother that Eve kidnapped Ignis at birth. Kat from the Series bears no resemblance. She is decades older, works as an accomplished doctor, and her story arc does not involve kidnapping. Ex. 3, Ep. 1 at 24:42–26:46; Ep. 7 at 36:56–38:31; *cf. Carlini*, 2021 WL 911684, at *12 (no substantial similarity between "a young woman in her mid-20s with a teaching job that does not appear to be a driving force in her life" and a "middle-aged, aggressive, self-absorbed, career-focused woman"). Instead, Kat supports Nicole (Kat's sister), and helps Dion recover in the hospital from the illness he experiences after attempting to heal Pat—none of which parallels any of Cat's experiences in the Novel. *See* Ex. 3, Ep. 7 at 16:42–18:39, 36:56–41:18. The only similarity between the characters is their commonplace name, which is not nearly enough to establish substantial similarity. *See Cavalier*, 297 F.3d at 828 ("Use of the same names does not sufficiently support infringement, especially when attached to such different characters.").

**Ignis and Dion.** Ignis is a triplet who was kidnapped at birth, raised by the villainous Eve until the age of six, and ultimately able to defeat Eve due to his supernatural ability to control fire and his deep connection with God. Dion is an only child with a deceased father, he has no apparent connection to religion, and he is raised by a fiercely devoted mother while developing his powers. Other than their approximate age, race, and possession of superpowers (albeit *different* superpowers)—which are not protectable elements, *see Abdullah*, 2016 WL 5380930, at *5—the only alleged similarity Plaintiff identifies is that certain illustrations in Comic Book depict Dion with golden-colored eyes, and *December's Eve* describes Ignis's eye color as being "golden" at times. FAC at 8. The depictions are not substantially similar. Ignis's eyes are described as "golden" because he has the exclusive ability to control fire. By contrast, both the Comic Book and Series show that Dion has a range of powers, such

as telekinesis, teleportation, and healing abilities.  *See* Ex. 2 at 5.  And depicting a superhuman character with a golden eye color is hardly the kind of expression that would be protectable. There are numerous examples of characters with supernatural abilities changing their eyes to a color such as gold or black, including in works such as *Heroes*.  Such a stock element flows naturally from the idea of characters with superhuman abilities and is not subject to protection.  *See Berkic*, 761 F.2d at 1293–94.

The Series also includes a large number of well-developed secondary characters with no counterparts in *December's Eve*, including Pat, Esperanza, Charlotte Tuck, Jonathan (one of Dion's elementary school classmates), and Suzanne Wu (a Biona executive).  And the triplets that team up with Ignis to defeat Eve's plot have no counterpart in *Raising Dion.  See Cavalier*, 297 F.3d at 825 (no substantial similarity where the main characters in the works at issue are different).

### (d)    Mood

This factor also weighs heavily against Plaintiff.  *December's Eve* tells a dark story of Eve's plot to kill off humanity, while including profanity and graphic depictions of kidnapping, poisoning, the murder of many innocent civilians, and a mass-murder in Eve's garden.  *See, e.g.*, Ex. 1 at 119–20 (Pastor Jimmy is killed while screaming profanities as the vines in Eve's garden "devoured him instantly—leaving only the horrid echo of his final dying breath"); *id.* at 164 (Eve kills Sheriff Drake by throwing him from a tower, where "his body produced a thunderous echo and his body parts plashed everywhere in microscopic pieces"); *id.* at 190 (Eve kills a judge by "[s]cream[ing] in ecstasy as she ripped his body in half with her own spiny, veins," at which point she "snatched his head from his body and threw it into the lake").

By contrast, the Short Film, Comic Book and Series, which is rated PG, are suitable for preteens.  The Short Film and Comic Book do not feature any violence or other criminal activity and focus on family-friendly depictions of Nicole's loving relationship to Mark and Dion.  Ex. 2 at 6–11, 14–21.  The Series is a dramatic, introspective superhero mystery.  While some characters are killed in the Series, much

of the violence is not shown, and the impact of the deaths is tempered by the fact that deceased characters such as Mark continue to have relationships with the living characters as ghosts.  Ex. 3, Ep. 8 at 42:28–43:59; *id.*, Ep. 9 at 37:33–39:48; *Funky Films*, 462 F.3d at 1080 (moods of works were "drastically different" because one was a "farcical mystery," while other was "serious, dramatic, and introspective").

### (e)    Setting

Nor are the settings of the works similar.  *December's Eve* is set entirely in rural Alabama in the 1960s.  By contrast, both the Comic Book and Series alternate between the present day and flashbacks to prior events (primarily set in 2010).  Most of the present day action takes place in Atlanta where Dion lives with Nicole, with occasional scenes in Iceland, at a farm in Alabama, in New Orleans, and at a lake house in Georgia. Ex. 3, Ep. 1 at 1:27–48, 31:25–40:06; Ep. 4 at; Ep. 8 at 23:28–26:28; Ep. 9 at 17:22–20:35; *see Cavalier*, 297 F.3d at 824 (no substantial similarity where the plaintiff's work lacked any scenes set in the "venues for significant parts of the [defendants'] stories").

Plaintiff's random, cherry-picked similarities are not enough to overcome these differences.  *Cf. Kouf*, 16 F.3d at 1045–46.  Plaintiff focuses on items in the respective settings like wood-burning heaters and television sets, but such stock elements are not protectable.  *See, e.g.*, *White v. Twentieth Century Fox Corp.*, 572 F. App'x 475, 477 (9th Cir. May 2, 2014) (shopping carts in grocery store scenes does not weigh in favor of substantial similarity because "[i]t goes without saying that nearly any grocery store scene . . . would feature shopping carts"); *Carlini*, 2021 WL 911684, at *13 ("[C]ommonplace settings such as houses, front yards, offices, restaurants, interiors of cars, and so on, without more, cannot show substantial similarity." (internal quotation marks omitted)).  Moreover, the nature of these objects is different in the works, given they are set more than 50 years apart.

The lake houses are also not similar (which Plaintiff appears to acknowledge). *See* FAC at 9; SAC at 9 (the lake houses in the Novel and Comic Book are "different"). The "lake house" in the Novel is Eve's primary home, and it contains features that

Mark's lake house lacks: including a "pit of hell" and a dangerous garden that kills scores of townspeople.  The lake house in the Comic Book and Series is Mark's former vacation home and serves as the site of Nicole's discovery of Charlotte Tuck's contact information—a subplot absent from *December's Eve*.  Ex. 3, Ep. 1 at 37:59–38:53.  Regardless, a lake house is a stock element featured in countless literary works.  *Cf. Funky Films*, 462 F.3d at 1080 (no substantial similarity despite the fact that both works "took place in a contemporary, family-run funeral home" because one was well-maintained, whereas the other was "in shambles"); *Shame on You*, 120 F. Supp. 3d at 1159 ("the mere fact that some portion of both works occurs in a city is too generic and inconsequential, and thus fails to meet substantial similarity." (cleaned up)).

### (f) Pace

The pacing of the works is also very different, and Plaintiff does not claim otherwise.  *See generally* FAC.  *December's Eve* begins with Eve's kidnapping of Ignis (set about six years before the Novel's primary events), but otherwise focuses on a relatively short period of time after Ignis's discovery of his triplet brothers.  Most of the plotlines develop rapidly.  For example, the triplets realize that they are brothers within minutes of meeting each other, Mr. Adam and Ignis succeed in climbing out of a deep pit beneath Eve's home in less than a day, and the triplets execute a plan to kill Eve within moments of witnessing the mass murder of their fellow townspeople.

By contrast, the Comic Book and Series take more time to develop key plotlines and focus on a lengthier, ten-year period that begins with the 2010 Icelandic event and extends to the present day.  Unlike *December's Eve*, the Series includes a number of important flashbacks from events that happened in the intervening time period—including scenes showing Mark's discovery of his powers, his attempts to investigate their source, his decision to rescue Charlotte from the Crooked Man, and his death.  The Ninth Circuit has found dissimilarity as a matter of law in copyright infringement cases where one work "moves at a rapid clip" while the other "evolves slowly and often in repetitive fashion."  *Funky Films*, 462 F.3d at 1080.  This Court should do the same.

### (g)   Dialogue

Plaintiff's dialogue analysis is limited to one alleged similarity: that both Cat and Esperanza ask to be put down after being levitated in the air by Ignis and Dion, respectively.  *See* FAC at 9.  Extended similarity of dialogue, however is needed to support a claim of substantial similarity, and the alleged comparison falls far short of that standard.  *Olson v. Nat'l Broadcasting Co*., 855 F.2d 1446, 1450 (9th Cir. 1988).

Plaintiff does not argue that the dialogue between the works is similar apart from this isolated example.  Nor could he, as they bear no resemblance.  The Novel's dialogue focuses on themes and events entirely absent in *Raising Dion*, including Eve's revenge plot, the triplets' reunion, and the power of faith in God.  Conversely, the Short Film, Comic Book, and Series feature modern dialogue, fleshing out plot elements such as Nicole's history with Mark, her efforts to help Dion grapple with racism and friendship, and the investigation into what happened at the Aurora Event.

### C.   *The FAC Should Be Dismissed Without Leave to Amend*

A court properly dismisses a copyright infringement action with prejudice where "amending the complaint would have been futile" because the plaintiff's work "and the allegedly infringing works are as a matter of law not substantially similar" and no new allegations "would change[] that dispositive fact."  *Rentmeester*, 883 F.3d at 1125.  Because no amendment could create substantial similarity where none exists, the case should be dismissed with prejudice.  *Fillmore*, 771 F. App'x at 757; *Ricketts*, 439 F. Supp. 3d at 1221; *Zella*, 529 F. Supp. 2d at 1130; *Bayman v. Disney Enters., Inc.*, No. CV 17-8827-DMG (JEM), 2018 WL 5094902, at *4 (C.D. Cal. June 1, 2018).

## V.   CONCLUSION

Accordingly, Plaintiff's FAC should be dismissed with prejudice.

DATED: February 14, 2022        By: */s/ Arwen R. Johnson*
ARWEN R. JOHNSON (SBN 247583)
*arwen.johnson@kslaw.com*
KELLY PERIGOE (SBN 268872)
*kperigoe@kslaw.com*

1

2

KING & SPALDING LLP
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone: (213) 443-4355
Facsimile: (213) 443-4310

Attorneys for Defendants

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28